**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| BERLINE Y. TERRELL, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **CASE NO.: 2:14CV014** |
| | : | |
| CAROLYN W. COLVIN, | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Berline Y. Terrell ("Terrell") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance under Title II of the Social Security Act. 42 U.S.C. §§ 401 - 434. Specifically, Terrell claims that the Administrative Law Judge ("ALJ") improperly evaluated the opinions of her treating physicians, failed to consider her work history in assessing her credibility, and erred in assessing her subjective complaints of pain. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

## I. PROCEDURAL BACKGROUND

Terrell filed a claim for disability insurance benefits ("DIB") on May 17, 2011 and alleged that she was disabled as of July 1, 2010. R. 122. The Commissioner denied her application initially, R. 70, and upon reconsideration. R. 79-81. Terrell then requested an administrative hearing. R. 86. ALJ James Quigley held a hearing September 20, 2012. R. 34-46.

On October 12, 2012, the ALJ concluded that Terrell was not disabled within the meaning of the Social Security Act and denied her claim for disability benefits. R. 20-29. The Appeals Council denied Terrell's request for review of the ALJ's decision on November 7, 2013 R. 1, thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Terrell filed this action on January 14, 2014 seeking judicial review of the Commissioner's final decision. This case is now before the Court on the parties' cross-motions for summary judgment.

## II. **FACTUAL BACKGROUND**

Terrell is 5' 3", 176 pounds, female, and high-school educated. R. 37, 144-45, 254. She was born September 27, 1963. R. 37. From 1985 to 2010, she worked as a fire watch coordinator at a Norfolk shipyard. R. 133-37, 152. As of July 1, 2010, Terrell claims that she is disabled due to multiple sclerosis, weakness in the left side of her body, a brain lesion, headaches, blurry vision, a pinched nerve/slipped disc in her neck and back, high blood pressure, high cholesterol, and diabetes. R. 144.

In mid-September 2009, Terrell underwent a cervical discectomy and fusion in an effort to cure neck pain due to spinal cord compression. R. 39, 258. She returned to work at the shipyard around January 2010 after she was "doing well" with a "pretty good range of motion in the cervical spine." R. 258 (notes of Dr. Charles Levy).

After working for two months, Terrell presented to Chesapeake General Hospital with complaints of parasthesia in her left side on July 6, 2010. R. 39, 431. She stayed four days to allow doctors to rule out the possibility of a stroke. R. 436. Five days prior, she had seen her primary care physician, Dr. Julius Miller with complaints of lightheadedness and headaches. R. 310. While at Chesapeake General, doctors conducted a CT scan and MRI of her brain and cervical spine. R. 431. The CT scan showed no intracranial abnormality, and the brain MRI was

2

unremarkable.   R. 431.   At her discharge, Terrell was "improved and stable" with "some heaviness and numbness in the arm."   R. 432.   Doctors added aspirin to her medications list and advised her to follow up with Dr. Miller and neurologist Dr. Soham Sheth.   R. 432.

On July 14, 2010, Dr. Miller saw Terrell to follow up her hospital stay.   R. 306.   Dr. Miller diagnosed her with cervicalgia and asked Dr. Sheth if he saw other issues in Terrell's spine MRI.   R. 305, 307.   Dr. Miller felt that Terrell could return to work upon her visit to Dr. Sheth.   R. 305.

On July 19, 2010, Terrell visited Dr. Sheth where her bilateral strength was 5/5, and her gait was normal.   R. 448.   She still felt some heaviness in her left upper extremity including difficulty grasping with her left hand, but her leg problems "ha[d] resolved."   R. 447.   Dr. Sheth noted that Terrell had T2 signal abnormalities suggestive of demyelinating disorders like multiple sclerosis ("MS").   R. 448.   A "multiple sclerosis variant like Devic's disease [was] also a possibility."   R. 448.   Dr. Sheth suggested a trial of IV steroids, but Terrell and Dr. Sheth deferred on treatment to resolve a possible yeast infection.   R. 448.

On July 28, 2010, Terrell visited neurosurgeon Dr. Charles Levy for assessment following the hospital stay.   R. 254.   Dr. Levy reported that her strength was 5/5 and "vigorous," and her reflexes were 1+ and symmetric.   R. 254.   She had a full range of motion of her cervical spine.   R. 254.   Dr. Levy's impression was that Terrell was doing well post-surgery with good decompression in her spine, adequate in all plains, and a solid fusion forming across the construct.   R. 254.   Dr. Levy had no further plan, but to follow up with Terrell in one year.   R. 254.

Terrell returned to Dr. Sheth on August 10, 2010.   R. 455.   Dr. Sheth reported that Terrell's laboratory work showed normal ESR and c-reactive protein.   Her Antinuclear Antibodies test was positive, suggesting the possibility of an autoimmune disease.   R. 455.

3

Terrell reported "feeling fine." R. 455. Her strength was 5/5 and her gait was normal. Dr. Sheth noted that Terrell had read the literature on MS medications, but did not want to pursue treatment because she was scared at that time. R. 455. Moreover, because her parasthesia flare-ups seemed to have resolved, Dr. Sheth concluded that she did not need IV steroids at the time. R. 455.

Terrell saw Dr. Miller the next week for a regular follow up concerning her constipation, essential hypertension, and rhinitis. R. 301-02. Dr. Miller noted a preliminary diagnosis of MS based on his communications with Dr. Sheth. R. 301.

On September 14, 2010, Dr. Sheth again saw Terrell. R. 464. Dr. Sheth again reported that Terrell had a normal gait and full bilateral strength. R. 464. Dr. Sheth reported that Terrell's symptoms had "mostly resolved," but she still reported difficulty standing for prolonged periods and occasional parasthesias. R. 464. She also reported occasional burning sensations in her chest and legs. Terrell again declined any MS medications. She did though express her concern with certain of her work duties. Specifically, she was uncomfortable with standing for periods and climbing ladders. R. 464.

Two weeks later, Terrell scheduled an urgent appointment with Dr. Sheth to assess the appearance of new symptoms including: radiating pain in her left flank area and pain and numbness in both her lower extremities. R. 466. On this visit, Dr. Sheth again reported that she had 5/5 strength in both lower extremities. R. 466. Dr. Sheth remarked that the "exact etiology of this [flank pain] is not clear." R. 466. Although it could have been an MS flare-up, Dr. Sheth "need[ed] to rule out any superimposed infection" as well as kidney and bladder problems. R. 466. As such, Dr. Sheth ordered further testing.

After a November 5, 2010 office visit, Dr. Miller prescribed Celebrex for Terrell's MS-related back pain. R. 293. Thereafter, an MRI of Terrell's lumbar spine revealed a L5-S1 disc

bulge with superimposed small disc protrusion, moderate right neuroforaminal stenosis and mild central stenosis, T12-L1 small central disc protrusion causing the ventral thecal sac compression, and T10-T11 small right paracentral disc protrusion with mild central stenosis. R. 358-59 (report of Dr. Salvavdor Trinidad, Chesapeake General Hospital). Dr. Miller later gave Terrell a Medrol Dosepak (tapering steroids). R. 472.

Terrell then reported to Dr. Sheth that most of her symptoms were resolved on November 15, 2010. R. 472. Dr. Sheth attributed this resolution to the steroids. R. 472. Dr. Sheth noted that the lumbar spine MRI showed "some disk bulge at L5-S1 with mild right foramen stenosis." R. 472. In addition though, she had no significant stenosis on her left side. Her gait was normal, and her strength in her lower extremities was "mostly normal." R. 472. Dr. Sheth concluded that an MS relapse most likely caused Terrell's symptoms.

On November 22, 2010, professionals at Chesapeake General performed a brain MRI and CT of Terrell's cervical spine. R. 513-14. The MRI showed a few focal white matter hyperintensities in the subcortical region of the left parietal lobe, which were consistent with demyelination. R. 513. The CT showed a stable cervical fusion at C4 through C7, a normal C2-C3 disc, bulging and degeneration of the C3-C4 disc and C7-T1 discs. R. 514.

Terrell continued to see Dr. Sheth during the winter of 2011. At a January 14, 2011 office visit, Dr. Sheth noted that Terrell had full strength, a normal gait, and brisk reflexes. R. 476. Despite her past use of steroids, Terrell continued to defer any treatment for her MS symptoms. R. 476.

On the referral of Dr. Sheth, Terrell sought the second opinion of Dr. Marcus Rice concerning her MS diagnosis and treatment. R. 280. During a January 26, 2011 office visit, Dr. Rice noted that Terrell had normal muscle bulk, normal muscle tone, normal strength, normal reflexes, normal balance, and normal gait. R. 282. Dr. Rice concurred with Dr. Sheth in his

5

assessment that Terrell had MS. R. 282. However, Dr. Rice went on to note that "her disease is quite mild so far." R. 283. He expressed that Terrell should be treated to prevent disease progression and relapses, but only with "the first line drugs." R. 283.

On February 17, 2011, Terrell denied having any new symptoms, but still reported occasional parasthesias in her extremities. R. 475. Being more receptive to MS medications at this point, Terrell said that she would report back to Dr. Sheth with her choice of medication. R. 475. Shortly thereafter, she began taking Copaxone for her MS symptoms. R. 474.

At an April 26, 2011 follow up, Terrell reported no new symptoms save occasional back pain and right shoulder pain. R. 474. Dr. Sheth found that her MS seemed to be stable and continued Terrell on Copaxone. R. 474. Three days later, she saw Dr. Miller. Dr. Miller diagnosed Terrell with shoulder bursitis. R. 288.

On May 13, 2011, Terrell presented to Dr. Sheth with complaints of left leg and arm weakness and pain. R. 473. Terrell reported that the pain and numbness had become more episodic. R. 473. Dr. Sheth remarked though that her "[s]trength to me again seems to be almost 5/5 on the left side, although there might be some mild give away weakness." R. 473. Moreover, Dr. Sheth stated: "At this point, I am not really sure that there is anything new going on." R. 473. Dr. Sheth later ordered an EMG and nerve conduction studies on June 7, 2011. R. 546. The results were "mostly unremarkable except for a mild slowing of the left ulnar nerve across the elbow." R. 546. Dr. Sheth found no worsening of her symptoms clinically. R. 546.

A follow-up MRI of Terrell's brain on June 22, 2011 showed a few focal white matter hypersensitivities and a new focus of hypersensitivity involving the posterior one-third of the corpus callosum, but without any abnormal enhancement. R. 557-58. Dr. Sheth prescribed the option of steroids, but refrained from altering her Copaxone because he did "not think there

6

[wa]s anything new clinically." R. 545. In July 2011, Terrell reported little benefit from the steroids in reducing pain, but Dr. Sheth reported 5/5 strength with a normal gait. R. 543.

Dr. Carolina Longa, a state agency physician, reviewed Terrell's medical records on June 20, 2011, and opined that Terrell could perform medium work. R. 53-54. That same month, Terrell reported that she had no problem grooming herself, preparing complete meals daily, washing dishes, doing laundry, shopping for groceries and clothes once a week, and that she enjoyed reading and watching television, and talked on the telephone to friends and family in a Function Report. R. 159-67. She also admitted that she could walk a quarter of a mile, before needing to stop and rest. R. 163.

In September 2011, Dr. Robert Castle, a state agency physician, reviewed Terrell's medical records and concluded that Terrell could perform light work with occasional climbing of ramps and stairs, stooping, and balancing. R. 65-66. Terrell reported similarly in a September 2011 Function Report. She noted that she had no problem grooming herself, doing a little laundry and cleaning, but stated that she could no longer prepare meals because she could not stand for long periods of time. R. 178-79. Terrell also stated in this report that she used the computer to shop for clothes, she enjoyed reading and watching television and she talked on the telephone to friends and family. R. 180-81. Terrell continued to report that she could walk a quarter of a mile. R. 182.

Thereafter, Dr. Sheth opined in November 2011 that some of Terrell's heaviness and parasthesias in her legs was most likely secondary to her spinal cord lesion. R. 618. Dr. Sheth "wonder[ed]" if the shoulder and joint pain was "more of an arthritis." R. 618. Terrell's strength and gait were both normal. R. 618. In December 2011, Dr. Sheth concurred with his earlier assessment. He noted: "I think her MS is currently stable. Most of her symptoms of joint pain . .

. is [sic] probably related to her arthritis rather than any flare up of the MS." R. 628. Dr. Miller agreed that Terrell's MS was stable following a November 2, 2011 office visit. R. 604-05.

In December 2011, Terrell saw Dr. Roger Lidman, a rheumatologist, to evaluate her joint pain. R. 614-16. Based on an X-ray report, Dr. Lidman opined that Terrell had arthritis in her hands, tendinopathy of the shoulders, and pateofemoral osteoarthritis of the knees. R. 617.

On January 10, 2012, Dr. Sheth completed an Attending Physician's Statement of Continued Disability after noting that Terrell's gait and strength were normal and her MS stable. R. 612. He indicated that Terrell could carry 11 to 20 pounds occasionally with the left arm and 21 to 50 pounds occasionally with the right arm; she could frequently lift 1 to 20 pounds with her right arm; she could reach without restriction on the right and frequently on the left; and she was unlimited as to fingering/handling. R. 622. Dr. Sheth stated that he could not comment on Terrell's ability to sit, stand, and walk because of the subjective nature of her complaints. R. 622. In the same visit, Terrell deferred on Dr. Sheth's recommendation for a dose of steroids and an MRI. R. 612.

In February 2012, Dr. Miller noted that Terrell's MS seemed to be stable. R. 599. In March 2012, he completed fatigue and MS questionnaires. On the fatigue form, Dr. Miller checked the box "yes" Terrell had fatigue, but declined to check a box on whether the fatigue was severe, noting that he was unsure. R. 596. Dr. Miller only answered one question of seven on the MS form, affirming that "yes" his patient suffered from MS. R. 597. Otherwise, he noted, "ask neurologist." R. 597.

Dr. Sheth continued to document Terrell's MS as stable in March 2012 and June 2012. R. 624-26. Dr. Sheth noted that Terrell "has been stable as far as multiple sclerosis is concerned, except mild worsening of [her] 25 step walking time." R. 643. He attributed her ongoing lower extremity problems to her spine lesions and lumbar radiculopathy. R. 643. Based on two June

2012 office visits, Dr. Miller appears to have deferred to Dr. Sheth on all MS treatment. See R.
632-33, 636 (diagnosing only constipation, rhinitis, and hyperlipidemia).

Next, an August 23, 2012, MRI of Terrell's thoracic spine showed lesions in the thoracic
spinal cord compatible with demyelination and mild central canal stenosis at T8-9 due to disc
protrusion, but no other significant spinal canal or foraminal stenosis in the thoracic spine. R.
653-55.

Finally in September 2012, Dr. Sheth completed MS and pain questionnaires. Dr. Sheth
checked "yes" that Plaintiff had: MS, related disorganization of motor function affecting two
extremities, a sustained disturbance of gross and dexterous movements, gait, and/or station, and
muscle weakness on repetitive activity. R. 650. Dr. Sheth though, checked "no," none of the
above was demonstrable on physical examination. R. 650. Similarly, on the pain questionnaire,
Dr. Sheth checked off boxes indicating that Plaintiff was in severe pain. He said, "yes" the pain
interfered with her sleep, ability to concentrate on job tasks, and activities of daily living. R.
651. However, he checked the box, "no," there is no definitive cause or etiology of Terrell's
complaints of pain. R. 652. Dr. Sheth noted it is likely MS. R. 652.

At the hearing before the ALJ, both Terrell and a vocational expert testified. R. 37, 43.
In response to the ALJ's question why she felt she was disabled, Terrell stated, "tingling in my
hand. I can't stand a long period of time. Numbness in my leg and in my arm and my back." R.
38. She responded, "yes," she had pain in those same places. Id. Terrell testified that she was
unable to work in 2010 after "the numbness" continued to return when she went back to work.
R. 39. Terrell testified that she cannot do any household chores – "no activity." R. 41. She
testified that since she left work in 2010, essentially all she can do each day is lie in bed. R. 41-
42.

9

The vocational expert, Robin Stromberg, testified that Terrell's past work was light duty, skilled labor performed by Terrell at the medium duty level. R. 44. Terrell's counsel asked if a hypothetical individual of the same age, education, and past work as Terrell who is off task up to twenty percent of the time due to her fatigue, weakness, muscle pain, and medication side effects, could perform Terrell's past relevant work or any other work activity in the national economy?" R. 44. She answered, "no."

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial

evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under the prescribed retirement age, file an application for disability insurance benefits, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. See 20 C.F.R. § 1520(a)(3). The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must answer:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

> 5. Does the individual's impairment or impairments prevent him or her from performing other jobs existing in significant numbers in the national economy?

20 C.F.R. § 1520(a)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. See id. §§ 1520, 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A. The ALJ's Decision

The ALJ concluded that Terrell had not been under a disability within the meaning of the Social Security Act between her alleged onset date, July 1, 2010 and his decision, October 12, 2012. R. 20, 29. The ALJ explained his decision thoroughly.

At step one, the ALJ found that Terrell met the insured status requirements of the Act through March 31, 2016 and had not engaged in substantial gainful activity since the alleged onset date, July 1, 2010. R. 22. At step two, he found that Terrell had the following severe impairments: "multiple sclerosis (left sided weakness, brain lesion, headaches, blurry vision); degenerative disc disease of the cervical spine status post C4-7 fusion (2009); and degenerative

12

changes of the thoracic spine." R. 22. At step three, the ALJ found that Terrell did not have an impairment or combination of impairments that met or equaled a listed impairment in Appendix 1. At step four, he found that Terrell could not perform her past relevant work, but that she could perform largely the full range of light work except that she cannot climb ladders, ropes, and scaffolds, and she can only occasionally balance, kneel, crouch, stoop, and climb ramps and stairs. R. 24. Finally at step 5, the ALJ found that there are jobs existing in significant numbers in the national economy that Terrell can perform based on her age, education, work experience, and residual functional capacity. R. 28.

More specifically, the ALJ accorded "substantial weight to [] Dr. Miller's records as they contain treating medical source opinions . . . ." R. 26. But, the ALJ gave "only minor weight to the questionnaire responses" because the record, including Dr. Miller's treating notes, indicated levels of fatigue not consistent with the questionnaire responses. R. 26. Likewise, the ALJ accorded "substantial weight to Dr. Sheth's opinion as a treating medical source," "aside from the opinions obtained in the questionnaires." R. 27 (emphasis added). The ALJ found that Dr. Sheth's treating notes did not support the conclusory questionnaire responses. R. 27.

Terrell advances three arguments urging the Court to reverse or vacate the Commissioner's decision. She argues that the ALJ (i) improperly evaluated the opinions of her treating physicians, (ii) failed to consider her work history in assessing her credibility, and (iii) erred in assessing her subjective complaints of pain. As set out below, the Court finds Terrell's arguments unpersuasive.

**B. The ALJ Properly Considered and Explained the Weight Given to Terrell's Treating Physicians' Opinions.**

Terrell argues that the ALJ failed to give proper weight to the "check-the-box" opinions of her treating physicians, Dr. Miller and Dr. Sheth. ECF No. 14 at 2. She concedes that the

13

Court must give deference to the ALJ's findings of fact, but maintains that here, the ALJ drew a conclusion from Terrell's physicians' reports that those same reports contradict. Id. at 5. Terrell argues that the ALJ "set his lay opinion against that of plaintiff's treating sources." Id. In effect, Terrell argues that the ALJ did not reach his conclusion about Terrell's ability to work (her residual functional capacity ("RFC")) "through application of the correct legal standard." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

The determination of disability is a question of law and is the sole the responsibility of the Commissioner. 20 C.F.R. § 404.1527(d). In determining a claimant's RFC and thus, whether she is disabled, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. Id. § 404.1527(c).

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. § 404.1527(c)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(c)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]."

14

SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.); see also 20 C.F.R. § 404.1527(c).  When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision.  Id. § 404.1527(c)(2).[1]

Here, the ALJ articulated "good reasons" why he did not accord the check-the-box forms completed by Dr. Miller and Dr. Sheth controlling weight.  Principally, the forms were "inconsistent with the other substantial evidence in [the] case record" including the same physicians' treatment notes and clinical observations.  Id.

First, it is clear that both Dr. Miller and Dr. Sheth are treating physicians.  That is, they are physicians who have observed Terrell's condition over a prolonged period of time.  Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983); see R. 284-342, 447-87, 543-52, 565-72, 594-613, 618-29, 632-641, 656-63.  From there, the ALJ delineated what weight he accorded those opinions and why.  See R. 26-27.  His decision to accord portions of the treating physicians' opinions less than controlling weight was not error.

The ALJ's decision conformed to the Social Security Administration's regulations.  See Craig, 76 F.3d at 590.  The regulations make clear that there is a positive correlation between the weight the Commissioner gives an opinion and the relevant evidence supporting that opinion.  See 20 C.F.R. § 404.1527(c)(3).  The Commissioner will give greater weight to an opinion when there is greater relevant evidence supporting it.  Id.  Likewise, "[t]he better an explanation a source provides for an opinion, the more weight [the Commissioner] will give that opinion."  Id.; see also Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.").  Here, the ALJ correctly applied this standard.

---

[1] In addition, under the applicable regulations, the ALJ must "explain" in his decision the weight accorded to all opinions – treating sources, non-treating sources, state agency consultants, and other non-examining sources.  20 C.F.R. § 404.1527(e)(2)(ii).

The ALJ found that Dr. Miller and Dr. Sheth's questionnaire responses were, in part, not supported by the medical evidence in their underlying notes. In reaching his conclusion that Terrell had mild stabilized MS without disorganization of motor function, the ALJ relied on the opinions of Dr. Miller and Dr. Sheth, as supported by the record as a whole. R. 24. Although Dr. Miller reported that Terrell suffered from fatigue in his questionnaire, he was unsure whether it was severe. R. 26, 596. Dr. Miller also deferred to Terrell's neurologist, Dr. Sheth, regarding MS and checked almost no boxes on the form. R. 597. Consistent with Dr. Miller's questionnaire, his notes indicated no functional limitation that would prevent Terrell from performing light work. His notes otherwise showed that Terrell's MS was stable. As such, the ALJ properly gave "substantial weight" to Dr. Miller's records, which consistently reported normal strength and gait, and assigned only "minor weight" to his questionnaire responses. R. 26; see Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

The ALJ assessed Dr. Sheth's questionnaire responses the same way. Importantly in his MS questionnaire, Dr. Sheth answered, "no," Terrell's MS symptoms were not demonstrable on physical examination. R. 650. From that answer, the ALJ reasoned that Dr. Sheth's questionnaire responses were based on Terrell's subjective complaints rather than his medical observations. R. 277. Terrell's medical record from Dr. Sheth affirms the inconsistency between Dr. Sheth's other questionnaire responses and the remainder of the record. Dr. Sheth continually opined that Terrell's MS was stable and her symptoms improved with medication. See R. 455, 464, 472, 474, 612, 624-26, 628. Dr. Sheth also documented that Terrell refused several treatments and medications. See R. 280, 448, 455, 464, 476.

In addition, because the treating notes of Dr. Miller and Dr. Sheth are so robust and consistent, the ALJ had ample objective medical evidence to serve as a backdrop for the brief questionnaire responses. Dr. Miller treated Terrell for approximately 41 months, while Dr. Sheth

16

treated her for approximately 26 months with frequent office visits. R. 284-342, 447-87, 543-52, 565-72, 594-613, 618-29, 632-641, 656-63. Dr. Sheth noted that Terrell's MS was stable on at least five different occasions. R. 455, 474, 612, 624-26, 628, 643. He reported her strength as normal, often 5/5, at least eight times. R. 448, 455, 464, 472, 476, 543, 612, 618. He reported her gait as normal eight times as well. Id.

Moreover, the nature of check-the-box questionnaires limits their value to the Commissioner. As the regulations state, where a treating source provides a better explanation of his opinion, that opinion will receive greater weight. 20 C.F.R. § 404.1527(c)(3). Here, the treating physicians' checked boxes came with little to no explanation. Dr. Sheth checked several boxes on the MS questionnaire, but left the comments section blank. R. 650. With respect to the pain questionnaire, Dr. Sheth noted that Terrell's pain was "sometimes" due to MS. R. 651. Based on the limited relevant evidence supporting the questionnaire responses and their lack of explanation, the ALJ was justified in according the questionnaire opinions little weight. See Craig, 76 F.3d at 590.[2] Because the ALJ fully explained why he accorded the questionnaire responses lesser weight, he committed no legal error.

## C. The ALJ's Finding on Terrell's Credibility Is Supported by Substantial Evidence.

Terrell next argues that the ALJ's decision was not supported by substantial evidence because he did not properly consider her work history and her subjective complaints of pain.

---

[2] In fact, the ALJ's finding here is strikingly similar to the Fourth Circuit's holding in Craig. Compare R. 27 ("Dr. Sheth stated the claimant had reported of severe pain, interfering with her activities of daily living and job tasks, but noted the only objective evidence was that 'pain is sometimes seen with MS and there was no definite cause or etiology of the claimant's pain complaints."), with 76 F.3d at 590 ("All Keller gave here was a conclusory opinion based upon Craig's subjective reports of pain. His own medical notes did not confirm his determination of 'disability.' On the same day, . . . he noted that there was 'no objective evidence of any joint swelling.' [And] on another occasion, Dr. Keller noted merely that Craig's 'headaches may be due in part to arthritis and/or disc disease.'").

The Court's inquiry is limited to whether there was "more than a mere scintilla," but "less than a preponderance" of evidence that Terrell was not disabled under the Social Security Act between July 10, 2010 and October 12, 2012. Laws, 368 F.2d at 642. As outlined below, the undersigned finds that substantial evidence supported the ALJ's decision.

### 1. The ALJ properly assessed Terrell's credibility for her subjective complaints of pain.

The ALJ concluded that Terrell's impairments could reasonably be expected to cause some of the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of those symptoms were only partially credible. R. 27. Terrell argues that the ALJ failed to properly evaluate her subjective complaints of pain.

Under both federal regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. First, the plaintiff must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594-95. "[W]hile a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including her own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint

motion, muscle spasm, sensory deficit or motor disruption," id. § 404.1529(c)(2); and (3) other

evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of

daily activities, medical treatments and medications, and descriptions of the pain or other

symptoms, id. § 404.1529(c)(3).

In addition, "[w]hen factual findings rest upon credibility determinations, they should be

accepted by the reviewing court absent 'exceptional circumstances.'" Eldeco, Inc. v. N.L.R.B.,

132 F.3d 1007, 1011 (4th Cir. 1997) (quoting NLRB v. Air Products & Chemicals, Inc., 717 F.2d

141, 145 (4th Cir. 1983)). "Exceptional circumstances" are those where the ALJ's determination

is "unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no

reason at all." Id.

Here, the ALJ cited ample evidence in the record to make his credibility determination.

Specifically, the ALJ noted that Terrell's examinations showed that she had full strength with

normal muscle bulk and tone, and a normal gait. R. 25; see R. 282, 464, 466, 473, 476, 543, 612,

628, 643. Similarly and consistently, Terrell's MS was diagnosed as stable and her symptoms

improved when she took medication. See R. 455, 464, 472, 474, 598, 604-05, 612, 624-26, 628,

636   Moreover, the ALJ's RFC aligns closely with the limits Terrell described in her function

reports. See R. 158-62. She reported that she was able to groom herself, prepare complete meals

daily, wash dishes, do laundry, shop for groceries and clothes once a week, read and watch

television, talk on the telephone to friends and family and walk a quarter of a mile. R. 159-63;

see 20 C.F.R. § 404.1529(c)(3)(i) (listing the claimant's daily activities as relevant factors to

consider in assessing credibility). This evidence stands in contrast to Terrell's testimony at the

hearing before the ALJ, where she testified that she has been largely restricted to lying in bed

since she left work in 2010. See R. 41-42 ("I really can't do anything. I'm in just so much pain,

numbness, and tingling.").

19

To the extent Terrell's testimony could be interpreted to require a more restrictive RFC, the ALJ explained his reasons for not so finding.  Both state agency doctors concluded that Terrell could perform at least light work.  R. 53-54, 65-66.  Dr. Sheth's opinion "essentially" found the same – Terrell could perform light work.  R. 27.  The ALJ reiterated that Dr. Sheth reported in January 2010 that Terrell had MS, but could occasionally carry 11 to 20 pounds with her left arm and 21 to 50 pounds with her right arm.  R. 26.  Dr. Sheth also reported that Terrell could frequently lift 1 to 20 pounds on her right side, could reach without restriction on the right, and was unlimited in her fingering/handling.  Id.  There is ample objective evidence in the record to reject her description during the hearing of allegedly work-disabling limitations.  Cf. R. 41.

Accordingly, the ALJ did not err in evaluating her credibility.  He performed the required analysis and articulated his reasons for not fully crediting Terrell's testimony.  See R. 24-28 (fully explaining the two-step analysis).  Substantial evidence supports the ALJ's finding.

### 2. The ALJ committed no error with respect to Terrell's work history.

Terrell was employed in some fashion from 1981 through 2011.  R. 130 (FICA earnings record).  She now argues that the ALJ "erred as a matter of law by failing to consider Mr. Terrell's [sic] stellar work history as part of the credibility determination made in the hearing decision." ECF No. 14 at 6.

Social Security regulations provide that "any symptom-related functional limitations and restrictions which [the claimant] . . . report[s], which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account." 20 C.F.R. § 404.1529(c)(3).  Among the factors the Commissioner will consider is the claimant's prior work record.  Id.

While Terrell is correct that a long and continuous work history may support the credibility of a testifying claimant, her admirable work history does not undermine the ALJ's

credibility assessment.  Again, the ALJ's credibility finding receives great deference.  <u>See</u>
<u>Eldeco, Inc.</u>, 132 F.3d at 1011.  Terrell cites several persuasive, but not binding, cases
expounding the principle that a claimant's consistent and laborious "prior work history justifies
the inference that when he stopped working he did so for the reasons testified to."  <u>Singletary v.</u>
<u>Sec'y of Health, Ed. & Welfare</u>, 623 F.2d 217, 219 (2d Cir. 1980); <u>see also</u> <u>Allen v. Califano</u>,
613 F.2d 139, 147 (6th Cir. 1980); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 409 (3d Cir. 1979).
However, the ALJ's mere failure to mention Terrell's work history explicitly does not warrant
remand or reversal in the face of his otherwise supported findings.  <u>See, e.g.</u>, <u>Cooper v. Astrue</u>,
4:10CV110, 2011 WL 6742500, at *7 (E.D. Va. Nov. 8, 2011) <u>report and recommendation</u>
<u>adopted,</u> 4:10CV110, 2011 WL 6749018 (E.D. Va. Dec. 22, 2011).  "Case law consistently
suggests that Plaintiff's work record, standing alone, is insufficient to contravene an ALJ's
credibility finding."  <u>Id.</u> (citing <u>Schaal v. Apfel</u>, 134 F.3d 496, 502 (2d Cir. 1998); <u>Laws v.</u>
<u>Astrue</u>, 3:08CV722, 2009 WL 3270770, at *6 (E.D. Va. Oct. 8, 2009)).  In short, work history is
just one of many factors.

Even if the ALJ misapplied one of the factors set forth in 20 C.F.R. § 404.1529(c), any
error was harmless.  <u>See</u> <u>Ambrose v. Astrue</u>, 2:11CV683, 2013 WL 1308981, at *12 (E.D. Va.
Mar. 28 2013) (holding that any failure by the ALJ to expressly address each factor set forth in
20 C.F.R. § 404.1527 was harmless error) (citing <u>Morgan v. Barnhart</u>, 142 Fed. App'x 716, 723
(4th Cir. 2005) (holding that even if a medical opinion was due special weight under the treating-
physician rule, any error in failing to credit the opinion was harmless); <u>Boone v. Halter</u>, 23 Fed.
App'x 182, 183 n. * (4th Cir. 2002) (per curiam) (upholding Commissioner's decision and
finding that to the extent the Commission failed to follow social security procedures, the plaintiff
failed to show resulting prejudice); <u>Camp v. Massanari</u>, 22 Fed. App'x 311, 311 (4th Cir. 2001)

21

(per curiam)).  The ALJ made clear that he based his credibility finding on the stout body of objective medical evidence in the record.  See R. 24-28.

Moreover, "the Court is not hamstrung by the words set forth in the ALJ's decision."  Id. "Though it may affirm only upon the reasons given, 'the reviewing court must base its decision on a review of the record as a whole and 'may look to any evidence in the record, regardless of whether it has been cited by [the Commissioner].'"  Id. (quoting Baxter v. Astrue, 3:11CV679, 2013 WL 499338, at *4 (E.D. Va. Feb. 7, 2013)).  Thus, even if the ALJ did not explicitly mention his consideration of Terrell's work history in making a credibility finding, the Court is not necessarily required to remand.  Rather, it defers to the ALJ because "it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence."  Hays, 907 F.2d at 1456.

Finally, Terrell's work history is not inconsistent with the Commissioner's finding.  Nor does it provide a basis to disregard the objective medical evidence in the record.  This objective medical evidence fully supports the ALJ's credibility finding.  The medical opinions of Dr. Sheth and Dr. Miller, her conservative treatment regime, and her self-documented function reports are consistent with an RFC of light work.  The fact that she maintained steady employment over the years is not inconsistent with the ALJ's finding that her MS, and other orthopedic conditions, while limiting, did not preclude all work during the period between July 10, 2010 and October 12, 2012.  While Terrell is correct that "a good work history may help a plaintiff in assessing her credibility, 'it cannot be a substitute for evidence of a medically supported disability.'"  Cooper, 2011 WL 6742500, at *7 (quoting Johnson v. Astrue, 4:10CV110, 2009 WL 3491300, at *7 (W.D.N.Y. Oct. 23, 2009)).  As such, the undersigned finds that the ALJ properly evaluated Terrell's credibility.

22

## V. **RECOMMENDATION**

For the foregoing reasons, the Court recommends that the Court DENY Terrell's Motion for Summary Judgment (ECF No. 13), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 15) and AFFIRM the final decision of the Commissioner.

## VI. **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

August 28, 2014